UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| ERIC G. HILKERT,<br><br>         Plaintiff,<br>v.<br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security Administration,<br><br>         Defendant. | Case No. 12-CV-55-JPS<br><br><br><br>ORDER |

Plaintiff Eric G. Hilkert ("Hilkert") brings this suit under 42 U.S.C. § 405(g) for judicial review of a final decision of the Social Security Administration denying his application for disability insurance benefits ("DIB") for lack of disability. (Docket #1); (Tr. 27); (Tr. 3).

1. BACKGROUND

  1.1  Procedural History

Hilkert's DIB claim was: (i) filed on November 20, 2007 (Tr. 189); (ii) denied initially on April 28, 2008 (Tr. 85); (iii) denied on reconsideration on August 6, 2008 (Tr. 94); (iv) denied by Administrative Law Judge Wayne L. Ritter ("ALJ Ritter") in a decision dated September 22, 2010 (Tr. 27), following a hearing on July 13, 2010 (Tr. 43); and (v) the Appeals Council of the Social Security Administration, in a decision dated November 21, 2011, denied Hilkert's request for review (Tr. 1-3).

  1.2  Date Last Insured: December 31, 2004

The parties agree that Hilkert's date last insured for DIB is December 31, 2004. (Docket #7, 2); (Docket #14, 3). Therefore, Hilkert must establish that he was disabled for DIB purposes on or before December 31, 2004. *See* 42

U.S.C. § 423(a)(1)(A) and SSR 83-20; *See also* Eichstadt *v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).

1.3 Background

Hilkert was born in 1962 and is a high school graduate with past relevant work as a dispatcher and printing press helper. (Tr. 66-67, 189 and 214).

Hilkert testified before ALJ Ritter that he was diagnosed with Multiple Sclerosis ("MS") around 1998. (Tr. 54). Hilkert recalls his MS originally presenting as optic neuritis at the age of 15. (Tr. 53).

The earliest medical record in the administrative transcript dates to April 3, 2000, when Dr. M. E. Rassouli ("Dr. Rassouli") saw Hilkert for a follow-up visit and noted "a history of Multiple Sclerosis which was in a remission state." (Tr. 309). From April 3, 2000, through July of 2003, Dr. Rassouli's progress notes indicate that: (i) Hilkert reported various pain – which Dr. Rassouli viewed as possible exacerbations of his MS – generally managed successfully with courses of Copaxin injections; and (ii) Dr. Rassouli continued to opine frequently that Hilkert's MS remained in "remission" or an otherwise "stable" state. (Tr. 278-309). During this period, Dr. Rassouli prescribed only one limitation for Hilkert: "to avoid the extreme heat, like hot weather and sauna" as these "may exacerbate the Multiple Sclerosis." (Tr. 292).

Opining as to an MRI of Hilkert's brain taken on March 9, 2002, the radiologist at the time noted: "[t]aking all factors into account, there is a mixed evolution of the white matter plaques with some areas slightly improved and some slightly more prominent than on the previous study." (Tr. 296).

Around July of 2003, Hilkert's insurance changed and the administrative record includes progress notes of Dr. Donald J. Hennessy ("Dr. Hennessy") who originally saw Hilkert in 2001 following a motor vehicle accident. (Tr. 350, 352). Dr. Hennessy's progress notes dated July 14, 2003, indicate that: (i) Hilkert's MS-related pain and exacerbations generally were managed by various medications including OxyContin, Prednisone, and Copaxone; (ii) Hilkert had "modest difficulties with tandem gait" and (iii) "[h]e has had difficulties with moods and takes Effexor 37.5 mg and does relatively well but he feels he has increasing stresses and he has taken 75 mg and felt that might do well as well or better." (Tr. 350).

On referral from Dr. Hennessy, Hilkert began seeing Dr. Genevieve Schmitt ("Dr. Schmitt") in July of 2003 "for neurologic evaluation and treatment plan[ning.]" (Tr. 380). She noted that "[p]atient has been on Copaxone now for the last number of years and has tolerated that without difficulty." (*Id.*). Hilkert reported: (i) "occasional exacerbations [of his MS] which he describe[d] as symptoms reminiscent of his old deficits"; (ii) that "in the past he has been continued on his Copaxone and treated intermittent [sic] with p.o. prednisone tapers when has had worsening of his lower extremity weakness and pain"; (iii) "some difficulty with mood"; and (iv) "some improvement in his symptoms" since restarting his prednisone taper and "some improvement since increasing his Effexor to 75 mg tablet." (*Id.*). Dr. Schmitt's notes of a neurological examination of the same date were generally normal with only slight abnormalities reported. (Tr. 379). For example, Hilkert's "gait was normal based" and "[h]e was able to tandem" although "[h]is lower extremity strength revealed some mild decrease in his iliopsoas bilaterally, the right being slightly greater than the left." (*Id.*). By

October of 2003, Dr. Schmitt's progress notes show Hilkert "doing relatively well" with regard to his MS "although he does continue to complain of fatigue and decreased energy level" notwithstanding his revelation that "he had been using OxyContin somewhat recreationally for 'a high.'" (Tr. 373). Then, in April of 2004, Hilkert reported various exacerbations to Dr. Schmitt regarding his MS, however, Dr. Schmitt's notes of April 23, 2004 opine that "patient's MRI shows a suggestion of underlying MS. However there is no evidence of definite progression of disease. There is no increased size of the lesions and no evidence of post gallium enhancement." (Tr. 364).

Based on another referral from Dr. Hennessy, Hilkert also saw Dr. Yogendra Bharat ("Dr. Bharat") for pain management. (Tr. 353, 355). A progress note dated June 15, 2004, states that "[p]atient does tell me that he is working full time" in the context of a discussion about the risks of narcotics addition. (Tr. 354).[1] A treatment note from the same date indicates that Hilkert "denies any treatment for depression" when asked about his psychosocial history. (Tr. 355). In a follow-up visit for "multiple site body pain, namely low back pain, lower extremity pain secondary to multiple sclerosis" Dr. Bharat noted on June 29, 2004, that Hilkert "states he felt about 85% better" after a course of Kadian and that generally "his pain is much better controlled." (*Id.*).

On December 30, 2004, in connection with a visit to Dr. Hennessy for an illness that had "lasted for 2 or 3 weeks," it was reported that Hilkert "has placed himself on prednisone that he got from Guadalajara" and Dr.

---

[1] In particular, under "Work History" it is indicated that Hilkert worked in his "own business" which involved "Real Estate" and had been working at his "present" job for 15 years. This conflicts with Hilkert's sworn testimony that the last time he worked was in 2003. (Tr. 51).

Hennessy opined that Hilkert should taper what he considered to be too high of a dose. (Tr. 692).

2.  APPLICABLE LAW

   2.1   The SSA's Five-Step Sequential Evaluation Process

   Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the [SSA] has promulgated regulations establishing a five-step sequential evaluation process to determine disability. See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income). If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

### 2.2 Standard of Review

The Commissioner's factual determinations are entitled to deference if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir.2008). "Substantial evidence" exists so long as there is "more than a scintilla" of evidence, such that "a reasonable mind might accept [it] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Young v. Barnhart* 362 F.3d 995, 1001 (7th Cir 2004).

The Court cannot "decide the facts anew, re-weigh the evidence or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Powers v. Apfel*, 207 F.3d 431, 434–35 (7th Cir. 2000) (citing *Perales*, 402 U.S., at 399–40, *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999)). Rather, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner" *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

"[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [its] decision and confine our review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir.1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)). "That is why the ALJ (not the Commissioner's lawyers) must 'build an accurate and logical bridge from the evidence to [the ALJ's] conclusion.'" *Steele*, 290 F.3d at 941 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001)). Therefore, "where the ALJ's decision 'lacks evidentiary support or is so poorly articulated as to prevent

meaningful review, the case must be remanded.'" *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007) (quoting *Steele*, 290 F.3d at 940).

3.  ISSUES

In his statement of errors, Hilkert identifies two categories of errors: (1) failure of the ALJ to properly weigh the medical evidence (Docket #7, 17); and (2) failure of the ALJ to properly evaluate Hilkert's credibility (Docket #7, 23).

As to the first category of errors – failure to properly weigh the medical evidence – Hilkert alleges in particular that ALJ Ritter erred by:

 3.1 failing to recognize that Dr. Khatri, a treating physician *after* the date last insured, gave a valid retrospective opinion regarding Hilkert's conditions as they existed during the relevant period (Docket #7, 18);

 3.2 making a residual functional capacity ("RFC") determination "that is inconsistent with all of the medical opinions in the record" (Docket #7, 21); and

 3.3 "finding that [Hilkert's] depression was non-severe during the period at issue" (Docket #7, 21).

As to the second category of errors – failure to properly evaluate Hilkert's credibility – Hilkert alleges in particular that ALJ Ritter erred by:

 3.4 "compar[ing] the credibility of the claimant against a pre-determined RFC findings [sic]" (Docket #7, 24); and

 3.5 "to the extent the ALJ did consider the record," making findings "insufficient to find Mr. Hilkert not credible." (Docket #7, 24-25).

4. ANALYSIS

In his decision, ALJ Ritter neatly summarized his view of the record as follows: "While the claimant has been diagnosed with MS, with both MRIs of the brain and cervical spine documenting evidence of abnormality, the undersigned notes that the overall evidence of the record does not reflect that it caused limitations, which precluded him from performing all work prior to December 31, 2004." (Tr. 23). To support this view of the record, ALJ Ritter's decision analyzes in detail the "medical evidence of record" dating from 2000 to 2009. (Tr. 18-23).[2]

    4.1    Evidence from Dr. Khatri

Hilkert's counsel asserts that "[t]he treating board certified neurologist, Dr. Khatri, opined that Mr. Hilkert's symptoms and limitations began as early as 1996 when he was diagnosed with MS (Tr. 663)" (Docket #7, 18). The assessment to which Hilkert's counsel refers: (i) is dated March 24, 2009 ("Dr. Khatri's 2009 Assessment"); (ii) is titled "MULTIPLE SCLEROSIS IMPAIRMENT QUESTIONNAIRE"; and (iii) bears the name of counsel's law firm.[3] (Tr. 658-664). Dr. Khatri answered the questionnaire by noting that his date of first treatment was August 6, 2007, and his most recent examination was March 6, 2009. (Tr. 658). ALJ Ritter summarized Dr. Khatri's 2009 Assessment as follows:

---

[2] The Court notes that, in contrast to some decisions of his colleagues that the Court has reviewed recently in the context of other cases, ALJ Ritter's decision regarding Hilkert's DIB claim is, in general, thorough, thoughtful and detailed. (Tr. 14-27).

[3] Binder & Binder of New York City.

> [I]n a report, dated March 2009, Dr. Khatri indicated the claimant continued to experience fatigue, balance problems, unstable walking, lower extremity weakness, numbness/tingling in the upper and lower extremities, poor coordination, difficulty remembering, problems with attention, depression, apathy, blurred vision, urinary incontinence, sensitivity to heat and emotional ability related to his MS. The doctor advised his most severe symptoms were his leg weakness and mild cognitive problems. He further noted the claimant experienced daily pain in his lower back and lower extremities, related to long periods of standing and sitting and advised the claimant required a walker to ambulate. However, he noted that during his initial evaluation in 2007, he was able to walk with only the assistance of a cane. Dr. Khatri indicated that the claimant was incapable of tolerating even low stress, as stress often exacerbated his symptoms. The doctor concluded it was likely the claimant would experience good and bad days and that he would be absent from work more than three times a month due to impairment related issues. He did not outline any exertional limitations but did indicate that limited vision, a need to avoid heights and the inability to push, pull, kneel bend and stoop would affect his ability to work at a regular job on a sustained basis (Exhibit 23F).

(Tr. 22).

Hilkert's counsel argues that Dr. Khatri's 2009 Assessment is a valid retrospective opinion that "must be considered and weighed under the treating physician rule." First, the Court finds Hilkert's counsel's characterization of Dr. Khatri's 2009 Assessment as an 'opinion' quite a stretch for a number of reasons: (i) in response to a question in the questionnaire asking, "What is the earliest date that the description of symptoms and limitations in this questionnaire applies?" Dr. Khatri wrote simply "diagnosed in 1996" and the Court finds that a reasonable person would read that guarded answer as evincing reticence to giving *retroactive*

effect to his *contemporaneous* assessment; and (ii) in response to a question asking him to identify the "laboratory and diagnostic test results which demonstrate and/or which support [his] diagnosis," Dr. Khatri listed vaguely only "MRI's [sic] by previous neurologist" without any additional detail and so, although those MRIs may give foundation for his assessment of the *contemporaneous* effects of Hilkert's MS (*i.e.*, as such stood in 2009 – nearly five years after Hilkert's date last insured), it is a stretch to say that Dr. Khatri intended his *contemporaneous* impairment assessment as *opining* as to the effects of Hilkert's MS *on or prior to December 31, 2004* (Hilkert's date last insured). Second, even if the Court were to view Dr. Khatri's 2009 Assessment as a retrospective opinion, Hilkert's counsel must remember that "[a] restrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligibility period." *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). Here, the Court finds that ALJ Hilkert's decision very amply builds an accurate and logical bridge from the contemporaneous medical assessments prior to Hilkert's date last insured to the conclusion that Dr. Khatri's 2009 Assessment is *not* corroborated by evidence contemporaneous with the eligibility period. Hilkert's counsel cites selectively to evidence contemporaneous with the eligibility period to argue in effect that Hilkert's MS was manifesting certain exacerbations, but he points to no evidence that such exacerbations rose to the level of been *disabling*. Notably, ALJ Ritter's decision points to an extensive amount of evidence contemporaneous with the eligibility period to paint a picture that Hilkert's MS was generally in remission and stable and, to the extent that exacerbations occurred, these were effectively controlled by medication. (Tr. 18-19; 23-24). In sum, the Court finds that ALJ Ritter's analysis was even-

handed and will not (in fact may not) re-weigh the evidence contemporaneous with the eligibility period.[4] ALJ Ritter's logical bridge is sturdy and must stand.

As against the backdrop set forth above, the Court finds that ALJ Ritter's decision cites substantial evidence to justify its treatment of Dr. Khatri's 2009 Assessment.

4.2     The RFC Determination

Hilkert's counsel next asserts that ALJ Ritter erred by making a RFC determination "that is inconsistent with all of the medical opinions in the record" (Docket #7, 21). The Court respectfully disagrees for the reasons set forth below.

In relevant part, ALJ Ritter's decision provides:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he was further limited to work involving no more than frequent climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; frequent balancing, stooping, crouching, kneeling, crawling; must avoid moderate exposure to extreme heat and all exposure to unprotected heights and hazards as well as the use of moving machinery.

(Tr. 17).

---

[4] *Estok* is noteworthy. There, the Seventh Circuit reasoned as follows: "Estok must establish through other evidence an actual disability during the insured period. It is not enough to show that she had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always…disabling." 152 F.3d at 640.

ALJ Ritter then explains his RFC finding as follows:

> In reaching this conclusion, the undersigned has given consideration to the previous determinations of the state agency consultants who found that the claimant did not have a severe impairment and that he could do a full range of medium work. While the undersigned agrees with the conclusion that the claimant did not have a severe mental impairment prior to his date last insured, the undersigned gives the claimant's subjective complaints more deference in finding that the claimant was somewhat more limited physically due to his MS, and thus capable of no more than light work. Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision).

(Tr. 25).

Indeed, ALJ Ritter's decision does analyze and weigh a range of medical and non-medical evidence of record to support his RFC finding. First, he observes a deficit of limitations opined during the relevant period. For example, Dr. Rassouli, a primary treating neurologist during the relevant period, opined that Hilkert's MS in 2002 required only a limitation to "avoid the extreme heat, like hot weather and sauna." (Tr. 292); (Tr. 24). In addition, Dr. Hennessy, another treating physician during the relevant period, was ostensibly asked to give a retrospective opinion because he had seen Hilkert during the relevant period and had access to charts from that period and he observed: "[i]n summary, during the time period you had sent a letter about, the patient had symptoms that were interrupting quality of life" though "[h]ow much this impacted his ability to make a living or function is not clearly delineated in the chart" and so he apologized that he could not

comment further. (Tr. 691); (Tr. 23). Second, ALJ Ritter weighed retrospective assessments by: (i) discounting the limitations in Dr. Khatri's 2009 Assessment because corroborating evidence contemporaneous to the relevant period was lacking (*see* Section 4.1 *supra*); (ii) affording some weight to the Physical Residual Functional Capacity Assessment of state agency physician Dr. Chan (Tr. 548-555), for example, because that retrospective opinion offered findings that align with both medical and non-medical evidence contemporaneous to the relevant period (Tr. 18-20, 25); and (iii) crediting to some extent Hilkert's subjective claims of MS-related difficulties during the relevant period (discussed more fully in Section 4.3, *infra*) to yield an RFC of less than the full range of light work (Tr. 25), which was more restrictive (and therefore deferential to Hilkert's subjective claims) than Dr. Chan's opinion that "MED RFC would have been appropriate during [the relevant] timeframe" (Tr. 554).

For the reasons set forth above, the Court finds that ALJ Ritter cites substantial evidence in his decision to support his RFC finding.

4.3     Hilkert's Depression

Next, Hilkert's counsel alleges error in ALJ Ritter's "finding that [Hilkert's] depression was non-severe during the period at issue." (Docket #7, 21). In particular, ALJ Ritter found that "[t]he claimant's medically determinable mental impairment of mood disorder, NOS (depression) did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere, prior to the date last insured." (Tr. 16).

Hilkert's counsel argues that the assessment of Dr. Todd Bofelli, provided on October 20, 2008, and set forth on a "Psychiatric/Psychological

Impairment Questionnaire" provided by Hilkert's counsel's law firm ("Dr. Bofelli's 2008 Assessment"), which identifies a range of mild to marked limitations due to depression combined with MS, should be considered a valid retrospective opinion because, in response to a question asking for "the earliest date that the description of symptoms and limitations in this questionnaire applies?" Dr. Bofelli wrote "at least 5 years ago," thus casting a shadow back to 2003, which is prior to Hilkert's date last insured of December 31, 2004. (Tr. 648-655).

Again, "[a] retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligibility period." *Estok*, 152 F.3d at 640. Here, ALJ Ritter addressed Dr. Bofelli's 2008 Assessment by noting that "there is also some discussion of issues with depression related to MS, prior to December 2004 but again the record indicates that this was effective [sic] addressed with medication and did not cause limitation in his ability to perform work activity."(Tr. 24). Similar to Section 4.1 *supra*, there is corroborating evidence contemporaneous with the relevant period that Hilkert complained of depression but *not of limitations therefrom that are more than minimal <u>and</u> not controlled by medication. See* SSR 96-3P; *see also Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007) (holding, in relevant part, that "the existence of these diagnoses and symptoms does not mean the ALJ was required to find that [the claimant] suffered disabling impairments. Contrary to any claim of severity, the ALJ concluded that at best [the claimant] had demonstrated nondisabling symptoms, and the record medical evidence established that those symptoms are largely controlled with proper medication and treatment") (citations omitted). Here, for example, Dr. Donald J. Hennessy opined in 2003 (*i.e.*, during the relevant

Case 2:12-cv-00055-JPS    Filed 01/14/13    Page 14 of 20    Document 17

period) that Hilkert "has done well with Effexor" as a drug to treat his depression and did not state any limitations relating to depression. (Tr. 350). Dr. Schmitt opined in October of 2003 that Hilkert suffered from only "[s]ome mood alternations" that were "most likely related to the underlying multiple sclerosis as well as possibly some discontinuation of his narcotic use" and recommended an increase in his dose of Effexor (Tr. 372), which ALJ Ritter noted in his decision when he acknowledged that in October 2003 there were "complaints of fatigue and decreased energy level, which were felt to be related to depression secondary to his MS and addressed with medication management." (Tr. 19). Moreover, ALJ Ritter considered the four broad functional areas in making his finding that Hilkert's depression "did not cause more than minimal limitation" in his ability "to perform basic mental work activities and was therefore nonsevere, prior to the date last insured." (Tr. 16-17); SSR 96-3p. Hilkert's counsel cites to portions of the medical record from the relevant period that note depression and one (non-recurring) notation of suicidal thoughts (Docket #7, 22),[5] but fails to point to any evidence contemporaneous to the relevant period that Hilkert's

---

[5] In particular, Hilkert's counsel cites to: Tr. 302 (where Dr. Rassouli notes in July of 2001 the word "depression" and but does not speak to limitation(s) therefrom); Tr. 309 (where Dr. Rassouli, in his first encounter with Hilkert (circa 2000), notes that Hilkert "feels very suicidal; although this is not new to him, this idea" but offers no indication of limitations therefrom); Tr. 350 (Dr. Hennessy noting on July 14, 2003 that Hilkert "has had difficulties with moods and takes Effexor 37.5 mg and does relatively well but he feels he has increasing stresses and he has taken 75 mg and felt that might do well as well or better" but offering *no* limitations in that connection); and Tr. 379 (Dr. Schmitt noting on July 15, 2003, "evidence of depression as well as fatigue" and opining that the fatigue "is most likely related to his underlying multiple sclerosis").

depression caused more than minimal limitation to perform basic mental work activities.

In light of the analysis set forth above, the Court finds that ALJ Ritter did not err in finding Hilkert's depression non-severe during the relevant period.

### 4.4 & 4.5    The Credibility Determination

Hilkert's counsel begins his attack on ALJ Ritter's credibility finding by arguing that the administrative law judge erred by "compar[ing] the credibility of the claimant against a pre-determined RFC findings [sic]" in his decision. (Docket #7, 24). Alas, ALJ Ritter's decision sums up his credibility finding in *two* places as follow:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 18); and

> Upon review of the entire record, including the claimant's testimony at the hearing, the undersigned finds the claimant's allegations that he was unable to work prior to and including the date last insured to be less than fully credible. While the claimant has been diagnosed with MS, with both MRIs of the brain and cervical spine documenting evidence of abnormality, the undersigned notes that the overall evidence of record does not reflect that it caused limitations, which precluded him from performing all work prior to December 31, 2004.

(Tr. 23).

This second formulation effectively cures any ill from the first and so Hilkert's counsel quickly turns to an alternative avenue of attack on ALJ Ritter's credibility finding by arguing that "to the extent the ALJ did consider

Case 2:12-cv-00055-JPS   Filed 01/14/13   Page 16 of 20   Document 17

the record," he erred by making findings "insufficient to find Mr. Hilkert not credible." (Docket #7, 24-25).

A court should overturn an administrative law judge's credibility determination "only if it is patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citation omitted).

Here, Hilkert's counsel submits that ALJ Ritter's credibility determination was based on the following findings: (1) "that Mr. Hilkert did not require emergency treatment or hospitalizations for his MS"; (2) "that the claimant self medicated with a variety of medications that were not prescribed to him"; (3) "that in July and October 2004 Mr. Hilkert's pain was found to be under control"; (4) "that the record contained inconsistent statements regarding whether Mr. Hilkert was actively working on his rental properties during the period at issue"; and (5) "that his activities of reading, watching television, and using the internet were compatible with the capacity to work." (Docket #7, 24).

Based on its review of ALJ Ritter's decision and the record, the Court finds it plainly apparent that ALJ Ritter based his credibility determination on a broader basis than Hilkert's counsel claims. In his decision, ALJ Ritter makes a range of factual findings relevant to the issue of credibility and, towards the end of his opinion, he sets forth the following synthesized analysis on the issue of credibility:

> It is noted that there is no evidence that he required frequent emergency treatment or hospitalization relative to MS issues. The undersigned notes that no treating source opined that he was disabled prior to the date last insured. Further, as outlined above, records from Dr. Rassouli reflect that he was stable and in remission, being effectively treated with medication during the period from 2000 through 2002. During this time, the

record reflects he experienced only intermittent exacerbations of symptoms, primarily related to lower extremity weakness and fatigue, which resolved with steroid treatment. The only limitations that Dr. Rassouli identified included avoiding extreme heat, like hot weather and sauna. Subsequent neurological exam by Dr. Schmitt in July 2003 revealed little evidence of abnormality. Additionally, subsequent progress notes from his treating physician, Dr. Hennessy also reflect stability. A subsequent MRI of the brain in 2003 showed no change from prior studies and while a cervical MRI did demonstrate some abnormality, it was not significant.

The undersigned notes that progress notes reflect that the claimant routinely self medicated with a variety of medications, including narcotics he received from friends and prednisone which he purchased off the Internet. In fact, in October 2003, he acknowledged that he took OxyContin to get "a high." While he continued to complain of multiple symptomatology, subsequent MRI's [sic] revealed no evidence of further progression. He was seen for pain evaluation and was placed on additional medication with significant report of improvement in pain control. In fact, the record reflects that in July 2004 the claimant acknowledged improvement in both activity and sleep and in October 2004, he reported he continued to work. While he was seen for complaints of chest and abdominal pain in December 2004, exam [sic] revealed no evidence of abnormality and it was determined that his symptoms were related to his chronic steroid use.

. . .

Further, while the claimant testified that he was diagnosed with MS in 1998, he acknowledged that he continued to work until 2003. He testified that although he stills own [sic] rental properties, he stated he has not done work on these since 2003. However, the undersigned notes that the record contains numerous statements to the contrary both prior to and after the date last insured. Additionally, his statements at the time he filed for benefits indicate that he was independent with regard to his personal care and was able to make simple meals for himself. He reported daily activities consistent with sedentary

> type work, such as a reading, watching television and using the Internet.

(Tr. 24).

The Court finds that the above passages illustrate that the foundation for ALJ Ritter's credibility determination is significantly more fulsome than the cherry-pickings raised by Hilkert's counsel in his brief. Moreover, the passages set forth above raise relevant considerations and do not place undue weight on any one consideration in particular. *See* 20 C.F.R. § 416.929.

With regard to points (1) through (4) in Hilkert's counsel's cherry-pickings, the Court is essentially asked to re-weigh the evidence. The Court may not do so. *Powers*, 207 F.3d at 434–35. As to point (5) raised by Hilkert's counsel – criticizing ALJ Ritter's observation that Hilkert "reported daily activities consistent with sedentary type work, such as a reading, watching television and using the Internet" (Tr. 24) – the Court finds that, viewed together with the totality of ALJ Ritter's credibility analysis and decision as a whole, that observation does not impermissibly place "undue weight" on Hilkert's household activities in assessing his ability to work outside the home. *Moss*, 555 F.3d at 562.

In light of the thorough explanation set forth in ALJ Ritter's decision (which the Court finds amply supported by the record), the Court simply cannot find the credibility determination in this case to be "patently wrong." *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012).

5.  CONCLUSION

For the reasons set forth above, the Court affirms the decision of ALJ Ritter.

Accordingly,

IT IS ORDERED that Administrative Law Judge Wayne L. Ritter's decision be and the same is hereby AFFIRMED; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14th day of January, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge